# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | **Case Number: 1:11-cr-079** |
| | : | |
| v. | : | **Chief Judge Susan J. Dlott** |
| | : | |
| **CHARLES PATTON,** | : | **ORDER DENYING MOTION FOR** |
| | : | **NEW TRIAL** |
| **Defendant.** | : | |

This matter comes before the Court on Defendant Charles Patton's *Pro Se* Motion for New Trial. (Doc. 67.) With that motion, Defendant Patton requested that the Court appoint new counsel to represent him and grant him a new trial on the basis that his trial counsel allegedly failed to properly advise him that he had no plausible defense to the charges against him prior to trial and committed ineffective assistance of counsel during trial, specifically during closing argument, by conceding to the jury that Patton possessed a package containing heroin.

The Government opposes Defendant's motion, arguing that defense counsel in fact discussed the merits of the case with Defendant on multiple occasions and that he was not ineffective by conceding possession of the package because the evidence of possession was overwhelming. (*See* Doc. 69.) The Court held a hearing on this matter, which subsequently was transcribed in part. (Docs. 75, 80.) For the reasons that follow, the Court DENIES Defendant's motion.

## I.     BACKGROUND

Pursuant to a multi-defendant indictment filed on June 15, 2011, Defendant Patton was charged with one count of conspiracy to possess with intent to distribute 100 grams or more of heroin in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B) ("Count One") and one count of

possession with intent to distribute heroin in an amount exceeding 100 grams in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), and 18 U.S.C. § 2 ("Count 2"). Patton originally was represented by James Maus, an attorney from the federal public defender's office. While represented by Maus, Patton moved to suppress statements he made to officers following his arrest. (*See* Doc. 27.) The Court held a hearing on Defendant's motion to suppress, and at the conclusion of the hearing, the Court denied Defendant's motion from the bench and inquired as to how the parties wished to proceed. (*See* Doc. 40.) Defendant Patton indicated that he may choose to take this matter to trial.

Shortly thereafter, Maus filed a motion to withdraw from the case. (Doc. 41.) On October 20, 2011, the Court granted that motion and appointed Attorney Peter Rosenwald to represent Patton. The Court set a new schedule, including a trial date of January 10, 2012, and over the course of the next several months, Patton and Rosenwald prepared for trial.

The Court held a final pretrial conference on December 20, 2011. Just prior to trial, at the request of the Government, the Court dismissed Count One of the Indictment, the conspiracy charge, and the Government proceeded under an aiding and abetting theory as to Count Two, the possession with intent to distribute charge. The evidence presented at trial included the testimony of several law enforcement officers and of Patton's co-defendant, Michael Lester.

That testimony painted the following general picture: During the latter half of 2010, United States Drug Enforcement Administration (DEA) Agents were investigating a heroin ring involving Defendant Lester. Several agents, including Ken Baker of the Cincinnati Police Department's DEA Task Force, had been given information about a delivery of heroin that would be driven down from Chicago, Illinois to Lester's house in Cincinnati, Ohio. On the night

of October 8, 2010, the agents received word that Chicago DEA agents were tailing two vehicles that were driving in tandem toward Cincinnati from Chicago. Eventually, Officer Baker picked up the tail of the suspected drug couriers and followed them to Michael Lester's residence, where other agents were waiting in parked unmarked vehicles.

Rather than pull over the suspected couriers, which could have tipped the Chicago dealers off to the DEA's investigation, the agents permitted the delivery and allowed the couriers to return to Chicago without any police intervention. The agents assumed that because Lester was on probation at the time and therefore was subject to random searches, he would not keep any drugs at his residence for a long period of time, and they suspected that someone would pick up any drugs that the couriers from Chicago delivered. Accordingly, the agents planned to "wall off," or prevent any further distribution of, the narcotics by arresting anyone who came to pick up the drugs from Lester.

A short time after the delivery took place, DEA Task Force Officer Josh Schlie, who had been stationed outside Lester's house, observed an individual, later determined to be Patton, arrive in a black Cadillac and pick up a small package. Another officer, Sean Woods, followed Patton as he left Lester's house and drove toward I-75. Officer Baker followed behind Officer Woods in an unmarked vehicle. Patton turned onto an I-75 on-ramp, and began swerving in his lane, driving very close to the barrier on the right side of the highway ramp. Officer Woods activated his lights and attempted to stop Patton, but Patton continued driving. Officer Woods observed Patton leaning to the right, and then he saw Patton throw a package out of his vehicle.

Moments later, Patton pulled over.[1]  After pulling Patton over, Officer Woods asked Patton what he threw out the window, and Patton denied having thrown anything.  Officer Woods then directed two uniformed patrol officers to transport Patton to the District Four Police Station.

In the meantime, Officer Baker remained at the scene of the traffic stop, and he and a few other officers searched for the package that Patton had thrown from his vehicle, eventually locating it on the side of the highway.  The package, which was later found to contain over 100 grams of heroin, was approximately six by six inches in width and three inches in thickness, and was marked with a fishtail.  According to Officer Baker, the amount of heroin recovered was consistent with amounts distributed for further trafficking rather than for personal use.  After locating the package, Officer Baker headed to the District Four Station, where he Mirandized and then questioned Patton.  This time, Patton admitted to throwing the package, but claimed he did so only because he did not know what the package contained.

Michael Lester was the last person to testify at Patton's trial.  According to Lester, Patton had been his barber for six or seven years.  Sometime prior to October 8, 2010, Lester approached Patton about storing drugs for him because Patton's roommate had been dipping into his supply.  Lester offered to pay Patton $500.00.  On October 8, Lester received the heroin from Chicago, for which he paid $50,000.00.  He then called Patton and told him to pick up the drugs.  Lester paid Patton $100.00 when he picked up the package.  In contrast to what Patton had told Officer Baker, Lester testified that Patton knew the package contained heroin.  Specifically, Lester claimed that he had discussed the contents of the package with Patton in order to ensure

_____

[1] During the trial, the Government showed a mobile video recording of the event that was consistent with Officer Woods' testimony.  (*See* Gov't Ex. 2.)

that Patton knew not to store the heroin in a cold place as cool temperatures would decrease the potency of the drugs.

Patton's trial lasted approximately two and a half days, and on the morning of January 12, 2012, the Court instructed the jury as to the requirements the Government needed to meet in order to prove Patton guilty beyond a reasonable doubt, including instructions as to the general elements of the crime of possession with intent to distribute as well as an instruction that the jury could alternatively find Patton guilty of that crime under an aiding and abetting theory. Those instructions, in relevant portion, were as follows:

POSSESSION WITH INTENT TO DISTRIBUTE

As I just stated, Defendant Charles Patton is charged with the crime of possession of heroin in an amount exceeding 100 grams with intent to distribute. Heroin is a controlled substance. For you to find the Defendant guilty of this crime, you must find that the Government has proved each and every one of the following elements beyond a reasonable doubt:

First, the Defendant possessed heroin in an amount exceeding 100 grams; Second, the Defendant knowingly or intentionally possessed the heroin; and Third, the Defendant intended to distribute the heroin.

Now I will give you more detailed instructions on some of these terms, beginning with the term "possession." To establish actual possession, the Government must prove that the Defendant had direct, physical control over the heroin, and knew that he had control of it. The Government does not have to prove that the Defendant was the only one who had possession of the heroin. Two or more people can together share possession over property. And if they do, both are considered to have possession as far as the law is concerned. But understand that just being present where something is located does not equal possession. The Government must prove that the Defendant had possession of the heroin, and knew that he did, for you to find him guilty of this crime. This, of course, is all for you to decide.

. . . Next, I will explain to you what the phrase "knowingly" means. To prove that the Defendant "knowingly" possessed the heroin, the Defendant did not have to know that the substance was heroin. It is enough that the Defendant

5

knew that it was some kind of controlled substance. Further, the defendant did not have to know how much controlled substance he possessed. It is enough that the defendant knew that he possessed some quantity of controlled substance.

Finally, I will explain to you what the phrase "intended to distribute" means. "Intended to distribute" means that the Defendant intended to deliver or transfer a controlled substance sometime in the future. To distribute a controlled substance, there need not be an exchange of money. In determining whether the Defendant had the intent to distribute, you may consider all the facts and circumstances shown by the evidence, including the Defendant's words and actions. Intent to distribute can be inferred from the possession of a large quantity of drugs, too large for personal use alone. You may also consider the estimated street value of the drugs, the purity of the drugs, and the manner in which the drugs were packaged. The law does not require you to draw such an inference, but you may draw it.

If you are convinced that the Government has proved all of these elements, say so by returning a guilty verdict on this charge. If you have a reasonable doubt about any one of these elements, then you must find the Defendant not guilty of this charge.

## POSSESSION WITH INTENT TO DISTRIBUTE: AIDING AND ABETTING

I will now instruct you on an alternative way in which you may find Defendant Patton guilty of the crime charged. For you to find Defendant Patton guilty of the crime of possession of heroin in an amount exceeding 100 grams with intent to distribute, it is not necessary for you to find that he personally committed the crime. You may also find him guilty if he intentionally helped someone else to commit the crime. A person who does this is called an aider and abettor.

But for you to find Defendant Patton guilty of possession of heroin in an amount exceeding 100 grams with intent to distribute as an aider and abettor, you must be convinced that the government has proved each and every one of the following elements beyond a reasonable doubt:

First, that the crime of possession of heroin in an amount exceeding 100 grams with intent to distribute was committed;
Second, that the Defendant helped to commit the crime;
And third, that the Defendant intended to help commit the crime.

Proof that the Defendant may have known about the crime, even if he was there when it was committed, is not enough for you to find him guilty. You can

consider this in deciding whether the Government has proved that he was an aider and abettor, but without more it is not enough. What the Government must prove is that the Defendant did something to help the crime with the intent that the crime be committed.

If you are convinced that the Government has proved all of these elements, say so by returning a guilty verdict on the crime charged. If you have a reasonable doubt about any one of these elements, then you cannot find the Defendant guilty as an aider and abettor of the crime of possession of heroin in an amount exceeding 100 grams with intent to distribute. . . .

After the Court's instructions to the jury, the Government made its closing argument, and then Rosenwald made a closing argument on Patton's behalf. During his argument, excerpted below, Rosenwald conceded that Patton possessed the package of heroin, but challenged the Government's proof with regard to Patton's knowledge and intent:

Good morning, ladies and gentlemen.

This will be the last time you'll hear from me. And bear with me. I have decided to work on getting a head cold, so I'll get through it but my voice may crack and I'll have to start over.

I think the first thing I have to say to you is thank you. Thank you for taking the time out of your lives to be here to perform what I think many of us in the criminal justice system believe is your highest civic duty. And I especially want to thank you for Charles Patton because Charles has asked that 12 people come down here, listen to what the government has to offer, and make that decision whether he's guilty or not guilty of what he's charged with.

To a certain extent, I probably could tag along with what Mr. Oakley just talked to you about and say, boy, this case is just so easy. What's the problem here? I mean, they've got everything. They've got a guy that's driving in a car that throws a package out of the window and it's heroin and it's a quantity of heroin that there's nobody going to inject that for their personal use in one night. I don't know how long it would last, but that's not personal; that's definitely distribution stuff. And that's the testimony you heard.

So what is there to talk about? Well, there's a lot to talk about because if you look at the government's case, and I'm going to generalize the facts here, and I will caution you that if by chance I say something that is not in your minds, I apologize, but it's what I believe that I heard during the course of the testimony.

What we have is an investigation involving the DEA coming out of Chicago starting, at least as far as Cincinnati was concerned, probably in early August, some two months that the government is working on this investigation. That is, heroin is being brought to the city of Cincinnati for further distribution into the community. And as it progresses, Michael Lester's name comes up or at least this 1132 California Avenue address comes up and so there is surveillance. Exactly how much, it's not clear to me. We know there's been some drive-bys. I'm not real clear whether before October the 8th there had actually been some sit-down surveillance or not, but they're watching this place. They've got the telephone wiretaps. They've got all this stuff.

But on October the 8th is when the action happens. That's when we've got the Escalade and the Impala coming down from Chicago and being tailed by Chicago until it hits the Indiana line, and then we've got Indiana tailing it until it hits Batesville, and then Cincinnati picks it up and takes it out to Bond Hill to California Avenue.

It appears that something was dropped off because the information was there is a fake compartment, I think it was the Escalade, and somebody was back there. I don't really recall testimony that they actually saw a package taken in, but that's the inference, that was taken in. And then the guys from Chicago leave.

And then Charles Patton shows up roughly an hour later, ballpark. His Cadillac pulls up on California Avenue and a guy gets out, walks up, and it looked like he picked up a package, it was small, it wasn't anything bulky or in a big bag or anything like that, went back to his car. And then some three or four minutes later, approximately, that's when the video starts. And you saw all that.

Now, I could make some kind of a stupid argument, oh, wait a second, you can't really see something coming out of the window of that Cadillac. Come on, it's just luck that somebody else had dropped a package. That's not fair to you and that insults your intelligence. Whether Charles likes for me to say this or not, he threw a package out the window of that Cadillac, three something in the morning on October the 8th of 2010.

Now, I know I asked questions about fingerprints, but they did fingerprints work to try to prove it and be sure that Charles handled it, and as it turns out, it's hard to get those prints so we don't have that print. But it's sort of there on the video. And we have Officer Woods saying, "I actually saw it come out the window because I've done this stuff before. I know what to look for when there's squirrelly action" – he didn't use that word, but -- "squirrelly action in the front seat." And we have Officer Baker saying, "We stopped right about where he said it happened, and this is what we found."

There's a package that's found, and we know – I am not going to pick on Heather Sczech. That's not fair. She did her job. There is a big spike that says that's heroin. We now know after that package has been opened up and tested by the lab, it is in fact heroin.

A little bit before that, sometime after 4 o'clock in the morning, I don't know what time, but just throwing some time after this stop at 3:30, Officer Baker is back at District 4, opens the package and does that field test, and he says it's positive, it's heroin. Now, I'm talking about that because when you start to really look at this case, which is what I'm going to ask you to do, I am asking you to do, we're talking about what he knew and what he intended, what did Charles Patton know and what did he intend on the early morning of October the 8th. Because, yes, the testimony is not recorded. I'd prefer it, be better, we wouldn't talk about it and discuss what was and wasn't said, but Officer Woods says, not on that video, but he asked and Charles Patton said, "I don't know what you're talking about, I didn't throw anything out," words to that effect. Whatever the exact words are, we don't know.

I want you to think about that for a second. If you've ever done something that you're perhaps not proud of, maybe shouldn't have done, and you're confronted, the first instinct for the majority of people is to say, "What are you talking about?" You deny it. Think about that moment for Charles with regard to throwing a package out the window and it's dark and his belief perhaps, you're entitled to decide what you wish to decide, how can he see it, how can he know. Well, now we got to go a little further down the road here when he's in that room at District 4 when it's a little bit different. Because now one of the things I believe that Officer Baker testified to as he's testing it or shortly after or in that time frame, "Hey, this is heroin, Charles. Why did you throw that out" – pardon me – "why did you throw that out the window?" It's a different situation now. There's something that says we've got a package, and not only that, this is stuff; and that's he says, "I threw it out because I didn't know what it was."

Now, I think you can infer and conclude that he had an idea that it might not be something he should have, but what the government has to prove, and there's a little bit of an ease here for them, they don't have to prove beyond a reasonable doubt he knew it was heroin, just that he knew beyond a reasonable doubt it was a controlled substance. Think about the package. It's not the same condition, but think about something that's all wrapped up in duct tape and all that sort of stuff is what did he know what was in there? Did he agree to pick up a package? I think the evidence is clear about that. Did he know what was in that package? Did he not only possess knowingly and intentionally with the intent to distribute, and the law allows you to look at that two different ways, either as a principal, as we call it, or as an aider and abettor, is he helping Michael Lester.

And that's where Michael Lester comes in. Because I kind of wondered if you've got this case with three officers and a forensic scientist saying that we've got this heroin in such a quantity and he possessed it, Charles possessed it, why do we need Michael in here when they've got all this case all together already? I'll suggest to you we've got Michael in here because he's the only one that said that Charles knew it was heroin.

Think about why Michael Lester is here. He's guilty. He's pled guilty to the conspiracy involved in this case, and I suggest to you he is looking for a benefit. He told you he was, and I think you can reasonably conclude that he's looking to get a benefit on whatever sentence he may face. But the government needs him so that they can show that Charles Patton knew that was heroin because he had to knowingly possess heroin. And the fact that Michael Lester is a multiple offender, trafficker, and possessor of controlled substances, that's going to mean that because he talked to Charles, that Charles knows all about his business.

I don't know whether you've ever held a package for somebody else or somebody else you can hold something. The one I think about sometimes is usually around Christmastime when the husband doesn't have a place to hide the present and gives it to somebody, a neighbor, and says hang on to this for me, and you believe it's a Christmas present and that's what it's going to be. I also think about if you've ever gone into an airport, you're going to hear this over and over and over again, don't accept something from a stranger because you don't know what you're going to get from them. In this case we have a situation where we have somebody who's a haircutter, who agreed to accept something from a friend.

What you will need to do, you have your instructions, I'm not going to go through those, you know what the law is from those instructions, you need to determine each and every element, see whether we get up to proof beyond a reasonable doubt. You need to find that he knowingly possessed that heroin. Did he knowingly possess a package? I think that's clear. Did he know that that was heroin or a controlled substance? You need to think about that. And whether you look at it from a principal or from an aider and abettor, you have to look at that and determine whether that's proof beyond a reasonable doubt. In fact, it's knowingly or intentionally possessed that controlled substance.

With the intention to distribute. Is that proven to you beyond a reasonable doubt, whether you look at it principal, aider and abettor. And it's all – you need to decide not what other people may be doing, Charles Patton. That's the whole case here. Is he in fact guilty by proof beyond a reasonable doubt of knowingly and intentionally possessing with the intent to distribute heroin.

Break it down. Break all the facts down in your head, determine what

people said or didn't say to determine whether the quality of the evidence is sufficient; and I'm suggesting if you do that, if you do your job, you're going to say no, it's not there, he's not guilty.

(Doc. 73.)  Following closing arguments, the jury deliberated for approximately one hour and fifteen minutes before returning a guilty verdict.

Approximately two weeks after the return of the verdict, Patton filed a *Pro Se* Motion for New Trial (Doc. 67) and a *Pro Se* Motion for Hearing to Address Conflict of Interest with Counsel (Doc. 70).  Rosenwald likewise filed a Motion for Hearing, citing Patton's *Pro Se* Motion for New Trial.  (Doc. 68.)  The Court set the matter for a hearing, which began, after a general statement of the purpose of the hearing, with the Government calling Rosenwald to testify.  (*See* Doc. 75.)  After Patton waived his attorney-client privilege on the record,[2] both the Government and Patton questioned Rosenwald about the advice that he gave Patton and about the conversations the two had prior to and during Patton's trial.  At the close of Rosenwald's testimony, the Court discharged him as counsel for Patton.  The Court then gave Patton the opportunity to present additional evidence in support of his *Pro Se* Motion for New Trial.  Patton briefly testified on his own behalf, and was cross examined by the Government.[3]

After that hearing, the Court appointed a new attorney, Scott Rubenstein, who

---

[2] During the hearing, the Court advised Patton that, based on the assertions Patton made in his motion, the Court understood Patton to be waiving his attorney-client privilege.  Patton agreed with that understanding and explicitly waived the attorney-client privilege as to his conversations with Rosenwald.  (*See* Doc. 80 at 7.)

[3] Because Patton was not advised of his right against self-incrimination immediately prior to his testimony and had not yet been appointed new representation, the Court does not consider Patton's testimony in ruling on his motion.  The Court notes, however, that even were the Court to consider his testimony, the Court's opinion would not change as Patton's testimony only further weakens his position.

subsequently filed a Supplemental Memorandum Supporting Patton's *Pro Se* Motion for New Trial. (Doc. 93.) The Court held a second hearing in order to give Rubenstein an opportunity to present supplemental evidence on Patton's behalf. During that hearing, both Rubenstein and the Government briefly questioned Rosenwald about the extent to which he discussed with Patton his decision to concede possession of the package of heroin during closing arguments. The Court then took the matter under consideration.

After reviewing the various defense motions, the supplemental memorandum, and the Government's responses, the Court concludes, for reasons explained herein that Patton fails to allege sufficient grounds to warrant a new trial.

## II. LEGAL STANDARD

Federal Rule of Criminal Procedure 33(a) permits district courts, "[u]pon the defendant's motion," to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). Where the grounds relied upon in seeking a new trial relate to the alleged ineffective assistance of counsel, the defendant generally must meet the two-pronged test set forth by the United States Supreme Court in *Strickland v. Washington,* 466 U.S. 668, 687 (1984).

The first prong of the *Strickland* test requires the defendant to show that "counsel's performance was deficient," or stated otherwise, "that counsel's representation fell below an objective standard of reasonableness." *Id*. at 687-88. The Sixth Circuit has cautioned that "[s]crutiny of counsel's performance is highly deferential," and "every effort must be made to eliminate the distorting effects of hindsight." *Goodwin v. Johnson*, 632 F.3d 301, 308 (6th Cir. 2011). In light of that deferential standard, the defendant must overcome a "'strong presumption' that the challenged action might be considered sound trial strategy." *Id*. (citing

*Strickland*, 466 U.S. at 689.)

Furthermore, even if a defendant can prove that counsel's performance was deficient, in most cases[4] the defendant will only be entitled to relief if he also can prove prejudice. Accordingly, under the second prong of the *Strickland* test, the defendant must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* In determining whether an attorney's alleged deficient performance resulted in actual prejudice to the defendant, a court must consider the totality of evidence before the jury. *Id.* at 695.

## III. ANALYSIS

As discussed further herein, Patton's ineffective assistance claim fails under either prong of the *Strickland* test.

### A. Deficient Performance

Patton alleges that Rosenwald rendered ineffective assistance both prior to and during Patton's trial by failing to properly convey to him that he had no plausible defense to the charges against him and by conceding to the jury that he possessed a package containing heroin.

#### 1. Advice Prior to Trial

Patton presents no evidence to support the first allegation. Rosenwald, an experienced criminal defense attorney, met with Patton several times during the months and weeks prior to trial. During those meetings, they discussed the elements of the crimes with which Patton was charged, and Rosenwald explained to Patton that the Government did not have to prove that he

---

[4] There are few exceptions, some of which are discussed herein.

was a drug trafficker in order to prove his guilt under the crimes charged.  Rather, the Government's theory would be that Patton aided his co-defendant in committing the crime of possession with the intent to distribute heroin.  Rosenwald explained to Patton that based on the evidence he expected the Government to present at trial, he believed there were no viable defenses and that Patton likely would be convicted if the matter went before a jury.  He also informed Patton shortly prior to trial that he had received confirmation that Patton's co-defendant planned to testify against him.  Despite Rosenwald's advice that Patton should consider the Government's plea offer, Patton persisted in his desire to go forward with a trial.

 Given Patton's relatively minor role in the charged trafficking conspiracy, this Court does not doubt that Patton may have had a difficult time accepting the fact that after being paid a small sum to hold a package for a friend, he found himself in federal court facing charges for which he could potentially be incarcerated for a number of years.  Nor does this Court doubt Patton's seemingly genuine shock that he was ultimately convicted under one of those charges.  However, the Court finds no reason to believe that Rosenwald in any way mislead Patton about the strengths and weaknesses of his case or that Rosenwald failed to disclose any pertinent information that would have led Patton to potentially reconsider his rejection of the Government's plea offers.  Rather, all evidence before the Court suggests that Rosenwald acted reasonably in attempting to apprise Patton of the serious nature of the charges against him and of the risks he would face by opting to go to trial.  Patton's first allegation of ineffective assistance is therefore unfounded.

### 2. Concession of Physical Possession During Closing Argument

Patton next argues that Rosenwald committed ineffective assistance during closing

argument by conceding that Patton had physical possession of the package of heroin recovered by the officers. Patton views that concession as tantamount to a complete admission of guilt to the crime charged.

The Supreme Court has indicated that although a defendant's "right to effective assistance of counsel extends to closing arguments[,] . . . counsel has wide latitude in deciding how best to represent a client, and deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage." *Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003). "Judicial review of a defense attorney's summation is therefore highly deferential." *Id*. at 6; *see also Cope v. United States*, 272 F. App'x 445, 448 (6th Cir. 2008).

Relying on *United States v. Swanson*, 943 F.2d 1070 (9th Cir. 1991), Patton contends that this case belongs in the narrow category of cases in which statements made by defense counsel during trial were so at odds with what might be expected of competent counsel as to warrant relief under *Strickland*. In *Swanson*, the Ninth Circuit found that defense counsel committed ineffective assistance by informing the jury during closing argument, without any perceptible strategic justification for making such a concession, that it was "his view of the evidence that there [was] no reasonable doubt regarding the only factual issues that [were] in dispute." *Id*. at 1074-76. Contrary to what Patton suggests, the differences between *Swanson* and the instant case speak louder than the similarities. First, the concessions defense counsel made in *Swanson* far exceed those made by defense counsel in this case, and second, there was a sound strategic basis for the approach taken by counsel in this case. In *Swanson*, defense counsel all but told the jurors they should find the defendant guilty. He made statements describing the evidence against

his client as overwhelming, incorrectly suggested that it was the defendant's burden to prove reasonable doubt and then contended that he did not "think it really overall comes to the level of raising reasonable doubt," and finally told the jurors that if they found his client guilty, they should not look back later and question whether they had made the right decision. *Id.* at 1077-78.

In the instant case, Rosenwald did not concede Patton's guilt during closing argument. Rather, in the face of overwhelming video and testimonial evidence that Patton physically possessed the package of heroin, albeit for a short period of time, defense counsel decided the best strategy would be to concede the element of possession and focus on challenging the Government's ability to prove knowledge and intent. Even in *Swanson*, the Ninth Circuit "recognize[d] that in some cases a trial attorney may find it advantageous to his client's interests to concede certain elements of an offense or his guilt of one of several charges." *Id.* at 1075-76 (citing *United States v. Bradford*, 528 F.2d 899, 900 (9th Cir. 1975) (counsel's assistance was not deficient where he conceded that the evidence identifying the defendants as the perpetrators was overwhelming, but argued that other elements of the crime were not proved in an attempt to persuade the jury to find the defendants guilty only of a lesser offense) and *Duffy v. Foltz*, 804 F.2d 50, 52 (6th Cir. 1986) (finding that counsel employed a reasonable trial tactic by admitting that his client committed the acts alleged but arguing that he was not guilty by reason of insanity)). Other courts, including the Sixth Circuit, similarly have found that the practice of conceding certain points or elements in order to maintain credibility with the jury or to focus the jury's attention toward a contested issue about which there is the greatest chance for reasonable doubt is a sound trial strategy. *See Wiley v. Sowders*, 647 F.2d 642, 649 (6th Cir. 1981)

(recognizing that while an "attorney may not stipulate to facts which amount to the 'functional equivalent' of a guilty plea," there are situations in which "[c]ounsel may believe it tactically wise to stipulate to a particular element of a charge or to issues of proof"); *United States v. Walker*, 24 F. App'x 57, 60 (2d Cir. 2001) (where there was overwhelming evidence against a defendant charged with unlawful possession of firearm and wire and mail fraud, defense counsel's strategic decision to try to maintain credibility with the jury by acknowledging during closing argument that the voice making inculpatory admission on tape recording was that of the defendant could not be considered ineffective assistance of counsel); *Foster v. Schomig*, 223 F.3d 626, 638 (7th Cir. 2000) (defense counsel did not commit ineffective assistance by conceding during closing argument that the defendant had killed his girlfriend as defense counsel made that concession in order to steer the jurors' attention toward the element of intent, the element on which he hoped to prevail); *United States v. Simone*, 931 F.2d 1186, 1196 (7th Cir. 1991) ("[W]hen the admissions concern only some of the charges to be proven, or when they do not actually concede guilt, counsel's concessions have been treated as tactical retreats and deemed to be effective assistance."); *Wilson v. Butler*, 813 F.2d 664, 670-71 (5th Cir. 1987) (defense counsel in a homicide prosecution was not ineffective for stating during closing argument that he thought the defendant was guilty along with co-participants where evidence of the defendant's complicity in the killing was overwhelming and, taken in context, the statement was part of strategy to cast doubt on whether defendant was trigger man in order to avert a conviction of first degree murder). Here, Rosenwald conceded only one of the factual issues in dispute – the issue on which he felt they had the least chance of a successful challenge. That strategy, while ultimately unsuccessful, was not outside the bounds of objective reason,

particularly given the options that remained by the close of the evidence.

A related matter, although not directly addressed in the briefing, is the extent to which Rosenwald was obliged to obtain Patton's consent prior to proceeding with the chosen strategy. Patton contends that the concession of physical possession was contrary to his wishes, and the issue of consent was the main focus of current defense counsel's examination of Rosenwald during the July 2, 2012 hearing. Rosenwald testified that although Patton never expressly gave his permission for the concession, Rosenwald had explained to Patton prior to closing arguments that the only feasible option he saw was to argue the issues of knowledge and intent, focusing specifically on whether the Government had proven beyond a reasonable doubt that Patton had knowledge of what the package contained.

The Sixth Circuit has held that an attorney may not concede a client's guilt contrary to an earlier-entered plea of not guilty without the defendant's express consent. *Wiley*, 647 F.2d at 649-50 (the defendant was deprived of effective assistance of counsel where defense counsel, without obtaining the defendant's consent, informed the jury during closing argument that the defendant was "guilty as charged" and "guilty beyond a reasonable doubt"). However, as discussed above, that is not what happened in this case. Rosenwald did not concede Patton's guilt; he merely conceded one element of the crime charged in order to shift focus to other disputed elements. *See Valenzuela v. United States*, 217 F. App'x. 486, 489-90 (6th Cir. 2007) (distinguishing *Wiley* from circumstances under which defense counsel conceded that the defendant sold a specific quantity of drugs on one occasion in order to downplay the extent of the defendant's participation in wider conspiracy and to advance an entrapment defense).

Furthermore, *Wiley* was limited to some extent by the Supreme Court's holding in

*Florida v. Nixon*, 543 U.S. 175, 188 (2004), that "counsel's strategic choice is not impeded by any blanket rule demanding the defendant's explicit consent," as long as counsel informed the defendant of the strategy before proceeding and counsel's performance satisfied the *Strickland* standard. *See also Davenport v. Diguglielmo*, 215 F. App'x. 175, 181 (3d Cir. 2007) ("Counsel's failure to obtain express consent from his client to pursue a strategy that includes a concession of guilt is not deficient performance per se."). And while there is precedent for the principle that counsel "'has a duty to consult with the client regarding 'important decisions,' including questions of overarching defense strategy,' which may include obtaining a client's consent to certain strategies," *Valenzuela*, 217 F. App'x. At 490 (citing *Nixon*, 543 U.S. at 187), this Court is unaware of any precedent requiring counsel to obtain the defendant's express consent before proceeding with a trial strategy that includes the stipulation of specific facts or limited issues. To the contrary, the Supreme Court has stated that an attorney's obligation of consultation "does not require counsel to obtain the defendant's consent to every tactical decision. *Nixon*, 543 U.S. at 187 (internal quotation omitted). The evidence before this Court is that Rosenwald informed Patton of the approach he planned to take during closing argument. While Patton is dissatisfied with the result, the Court finds no basis to conclude that Rosenwald's representation of Patton either prior to or during trial was in any way deficient.

### B. Prejudice

As stated above, Patton's ineffective assistance claim fails under either prong of the *Strickland* test. Even if Rosenwald's representation could be categorized as deficient, Patton has not demonstrated that any steps Rosenwald took resulted in actual prejudice.

Patton argues that this case falls within the exception outlined in *United States v. Cronic*,

466 U.S. 648, 558 (1984), a case decided on the same day as *Strickland*, thereby relieving him of the burden of proving prejudice. In that case, the Supreme Court acknowledged that there are some circumstances where the lack of effective counsel is so egregious that prejudice may be presumed. The Court identified three such situations: first, where the defendant has been denied the presence of counsel during "a critical stage" of the proceedings, such as the defendant's arraignment; second, where "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing;" and third, where counsel is called upon to render assistance under circumstances where even competent counsel very likely could not provide effective assistance. *Id*. at 559, 560; *see also Bell v. Cone*, 535 U.S. 685, 695-96 (2002).

In the instant case, Patton focuses on the second scenario, which the Ninth Circuit found applicable in *Swanson. See* 943 F.2d at 1074-75. Patton argues that Rosenwald's statements, like the statements of defense counsel in *Swanson*, were tantamount to an admission of guilt, resulting in such a complete breakdown of the adversarial process that prejudice should be presumed. Again, Patton's reliance on *Swanson* is misplaced. This Court has already addressed the differences between the attorney's conduct in *Swanson* and defense counsel's conduct in the instant case – namely that Rosenwald's concession applied to only one of the disputed elements. Here, even if the Court were to consider defense counsel's decision to concede possession of the heroin to amount to deficient performance, that concession was not such a complete failure to oppose the prosecution as to bring counsel's performance within the scope of *Cronic. See Bell*, 535 U.S. at 696-97 (in order for the *Cronic* presumption to arise based on an attorney's failure to test the prosecution's case, the attorney's failure must be complete); *Nixon*, 543 U.S. at 189 (noting that the *Cronic* presumption of prejudice is "reserved for situations in which counsel has

entirely failed to function as the client's advocate."); *Moss v. Hofbauer*, 286 F.3d 851, 861 (6th Cir. 2002) (noting that the Sixth Circuit has "applied *Cronic* only where the constructive denial of counsel and the associated collapse of the adversarial system is imminently clear"); *United States v. Holman*, 314 F.3d 837, 839 n. 1 (7th Cir. 2002) ("*Cronic* only applies if counsel fails to contest any portion of the prosecution's case; if counsel mounts a partial defense, *Strickland* is the more appropriate test.").

Accordingly, to prevail on his claim of ineffective assistance, Patton would be required to demonstrate prejudice, and his failure to do so constitutes a second and independent reason why this Court denies Patton's motion. As indicated above, the Government's case against Patton was so strong that this Court finds little if any basis to conclude that the jury's verdict would have been different had Patton's attorney not conceded physical possession. *See Manley v. Ross Correctional Inst.*, 314 F. App'x 776, 786 (6th Cir. 2008) (substandard performance of defense counsel did not prejudice the defendant where there overwhelming evidence of guilt)*; Poindexter v. Mitchell*, 454 F.3d 564, 582 (6th Cir. 2006) (finding that, even assuming defense counsel's statements could be construed as an admission of guilt, there was no reasonable probability that the outcome of the trial would have been different because the evidence that the defendant was guilty was overwhelming); *Haynes v. Cain*, 298 F.3d 375, 382-83 (5th Cir. 2002) (Even if defense counsel's failure to obtain the defendant's consent prior to conceding guilt to second degree murder in an attempt to avoid a first degree murder conviction might qualify as deficient performance, the defendant failed to establish prejudice in light of the overwhelming evidence against him, and he therefore was not entitled to relief under *Strickland.*). Patton certainly has not shown a "reasonable probability" that the "result of the proceeding would have

been different." *Strickland*, 466 U.S. at 694.

As Patton fails to prove ineffective assistance of counsel, the basis upon which he seeks a new trial, the Court finds he is not entitled to the requested relief.

## IV.     CONCLUSION

For the reasons stated above, the Court **DENIES** Defendant's *Pro Se* Motion for New Trial.  (Doc. 67.)

IT IS SO ORDERED

_____s/Susan J. Dlott_____
Chief Judge Susan J. Dlott
United States District Court
